THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile:  858/794-1450
kah@weiserlawfirm.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: 610/225-2677
Facsimile:  610/225-2678

Attorneys for Plaintiff Walter Hamilton

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re CADENCE DESIGN SYSTEMS, INC. SECURITIES AND DERIVATIVE LITIGATION | ) ) ) ) ) | No. C-08-4966 SC<br><br>NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF |
|---|---|---|
| This Document Relates To:<br><br>        Nos. CV-10-01849-SC, CV-10-03607-SC, and CV-10-03627-SC. | ) ) ) ) ) ) ) | DATE:          July 22, 2011<br>TIME:          10:00 a.m.<br>CTRM:        The Honorable Samuel Conti<br>                   Courtroom 1, 17th Floor |

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................2

II.    OVERVIEW OF THE ACTIONS ..........................................................................4

III.   SUMMARY OF SETTLEMENT HISTORY ..........................................................6

IV.    THE SETTLEMENT TERMS.................................................................................7

V.     THE PROCESS AND STANDARDS FOR PRELIMINARY APPROVAL OF A
       DERIVATIVE SETTLEMENT..............................................................................10

       A.    Public Policy Favors the Settlement of Litigation ....................................10

       B.    Preliminary Approval Requires Only that a Settlement Be Within the
             "Range of Possible Approval" and Not Disclose Grounds to Doubt Its
             Fairness or Contain Obvious Deficiencies.................................................11

VI.    THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND
       ULTIMATELY FINALLY APPROVED AFTER NOTICE TO CURRENT
       CADENCE STOCKHOLDERS ............................................................................13

       A.    The Stipulation Is the Result of Arms-Length Bargaining With the
             Oversight of a Neutral Mediator and Thus There Are No Grounds to
             Doubt Its Fairness .....................................................................................13

       B.    The Settlement Was Negotiated Only After Substantial Investigation and
             Analysis by Counsel Abundantly Experienced in Similar Complex
             Derivative Litigation..................................................................................14

       C.    The Settlement Serves the Best Interests of Cadence and Current Cadence
             Stockholders...............................................................................................14

       D.    The Risk, Expense, Complexity, and Likely Duration of Future Litigation
             of the Actions Weighs in Favor of Preliminarily Approving the Settlement ........16

VII.   THE FEE AWARD TO PLAINTIFFS' COUNSEL AND THE SERVICE
       AWARDS FOR PLAINTIFFS ARE FAIR AND REASONABLE ....................18

VIII.  PROPOSED SCHEDULE OF EVENTS...............................................................19

IX.    CONCLUSION....................................................................................................20

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Bell Atl. Corp. v. Bolger,*
  2 F.3d 1304 (3d Cir. 1993)..............................................................................................15

*Berkey Photo, Inc. v. Eastman Kodak Co.,*
  603 F.2d 263 (2d Cir. 1979)............................................................................................16

*Class Plaintiffs v. City of Seattle,*
  955 F.2d 1268 (9th Cir. 1992) ........................................................................................13

*Cohn v. Nelson,*
  375 F. Supp. 2d 844 (E.D. Mo. 2005)........................................................................10, 15

*Ellis v. Naval Air Rework Facility,*
  87 F.R.D. 15 (N.D. Cal. 1980),
  *aff'd,* 661 F.2d 939 (9th Cir. 1981)................................................................................12

*Hensley v. Eckerhart,*
  461 U.S. 424 (1983)........................................................................................................18

*In re Apollo Group, Inc. Sec. Litig.,*
  No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008),
  *rev'd,* No. 08-16971, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010) .......................16

*In re Apple Computer Sec. Litig.,*
  No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608
  (N.D. Cal. Sept. 6, 1991) ................................................................................................16

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995)..............................................................................................10

*In re Lorazepam & Clorazepate Antitrust Litig.,*
  205 F.R.D. 369 (D.D.C. 2002).........................................................................................18

*In re McKesson HBOC, Inc. ERISA Litig.,*
  391 F. Supp. 2d 844 (N.D. Cal. 2005) ............................................................................18

*In re Mercury Interactive Corp. Sec. Litig.,*
  618 F.3d 988 (9th Cir. 2010) ..........................................................................................19

*In re NVIDIA Corp. Derivative Litig.,*
  No. C-06-06110-SBA (JCS), 2008 WL 5382544
  (N.D. Cal. Dec. 22, 2008) ....................................................................................... *passim*

**Page**

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ..................................................................................10, 13

*In re Paypal Litig.*,
    No. C-02-1227-JF PVT, 2004 WL 2445244
    (N.D. Cal. Oct. 13, 2004).............................................................................................18

*Ingram v. Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001).................................................................................18

*Linney v. Cellular Alaska P'ship*,
    151 F.3d 1234 (9th Cir. 1998) .....................................................................................12

*Maher v. Zapata*,
    714 F.2d 436 (5th Cir. 1983) .......................................................................................10

*Mills v. Electric Auto Lite Co.*,
    396 U.S. 375 (1970)......................................................................................................17

*MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*,
    797 F.2d 799 (9th Cir. 1986) .......................................................................................10

*Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004)...........................................................................14, 16

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ...........................................................................12, 15, 16

*Satchell v. Fed. Express Corp.*,
    No. C 03-2878 SI, 2007 WL 1114010
    (N.D. Cal. Apr. 13, 2007) ............................................................................................11

*Simon v. Toshiba Am.*,
    No. 07-06202, MHP, 2010 WL 1757956
    (N.D. Cal. Apr. 30, 2010) ............................................................................................18

*Torrisi v. Tucson Elec. Power Co.*,
    8 F.3d 1370 (9th Cir. 1993) .........................................................................................12

*Unite Nat'l Ret. Fund v. Philip Watts*,
    No. 04CV3603, DMC, 2005 WL 2877899
    (D.N.J. Oct. 28, 2005)..................................................................................................17

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910)......................................................................................................10

**Page**

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986) ........................................................................10

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
    Rule 23.1(c)...............................................................................................10
    Rule 23(e)..................................................................................................11

**SECONDARY AUTHORITIES**

4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* (4th ed. 2002)
    §11.50 .......................................................................................................16

7 William Rubenstein, Alba Conte, Herbert B. Newberg, *Newberg on Class Actions*
    (4th ed. 2010)
    §22.110 .....................................................................................................11

*Manual for Complex Litigation (Fourth)* (4th ed. 2010)
    §13.14........................................................................................................10
    §21.632......................................................................................................10
    §21.633..................................................................................................10, 11
    §21.634......................................................................................................11

*Manual for Complex Litigation (Third)* (3d ed. 1995)
    §30.41....................................................................................................11, 15

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on July 22, 2011, at 10:00 a.m., or as soon thereafter as counsel may be heard, Plaintiffs Walter Hamilton, Arash Samani and George Powers ("Federal Plaintiffs") will appear before the Honorable Samuel Conti, Senior District Court Judge, at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, Courtroom 1, 17th Floor, San Francisco, California 94102, to move for an order granting preliminary approval of the Settlement set forth in the Stipulation of Settlement dated June 7, 2011 ("Stipulation" or "Settlement"), and filed contemporaneously herewith.[1]  The Stipulation resolves all shareholder derivative claims in the three related shareholder derivative actions currently pending before this Court (the "Federal Court"): *Hamilton v. Fister*, No. CV-10-01849-SC, *Samani v. Fister*, No. CV-10-03607-SC, and *Powers v. Fister*, No. CV-10-03627-SC (collectively the "Federal Actions"). The Stipulation also resolves all related shareholder derivative claims pending in the Superior Court of the State of California, Santa Clara County, in the action entitled: *In re Cadence Design Systems, Inc. Deriv. Litig.*, No. 1:08-CV-127922 (the "State Action").[2]

The Motion is based on the accompanying Memorandum of Points and Authorities in Support of Preliminary Approval of Settlement, the Stipulation, the Declaration of Robert B. Weiser in Support of Preliminary Approval of Settlement (the "Weiser Decl."), the [Proposed] Order Granting Preliminary Approval of Derivative Settlement (and Exhibits A-1, A-2 and B thereto), and such additional evidence or argument as may be required by the Court.  By their signatures to the Stipulation, the Federal Plaintiffs understand that all parties to the Actions support the relief sought in this Motion.

---

[1]  All capitalized terms herein shall have the same meaning as set forth in the Stipulation.  All Settling Parties support the request for preliminary approval of the proposed Settlement. References herein to "Docket No. _" are to documents filed in C-08-4966 SC.  References herein to "Hamilton Docket No. __" are to documents filed in CV-10-01849-SC.

[2]  The Federal Actions and the State Action are collectively referred to herein as the "Actions."

MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT - C-08-4966 SC          - 1 -

## ISSUE TO BE DECIDED

Is the Settlement, which provides for substantial Corporate Governance Enhancements to be enacted by Cadence, within the range of possible approval such that notice of the Settlement should be directed to Current Cadence Stockholders and a date for a Settlement Hearing should be set by the Court?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

This Memorandum is submitted in support of the Motion for entry of an order granting preliminary approval of the Stipulation of Settlement dated June 7, 2011 (the "Stipulation" or "Settlement") of the derivative claims brought on behalf of Cadence Design Systems, Inc. ("Cadence" or the "Company") against certain of its current and/or former officers and directors. The Settlement resolves the derivative claims pending in this Court in three related derivative actions: *Hamilton v. Fister*, No. CV-10-01849-SC (the "*Hamilton* Action"), *Samani v. Fister*, No. CV-10-03607-SC (the "*Samani* Action"), and *Powers v. Fister*, No. CV-10-03627-SC (the "*Powers Action*") (the "Federal Actions"), as well as all related shareholder derivative claims pending in the Superior Court of the State of California, Santa Clara County, in the action entitled: *In re Cadence Design Systems, Inc. Derivative Litig.*, No. 1:08-CV-127922 (the "State Action"). The Settlement provides significant Corporate Governance Enhancements for Cadence, and represents an excellent resolution for Cadence of a case of substantial complexity and potential costs. This Settlement is the result of extensive arm's-length negotiations between the Settling Parties which were overseen by retired United States District Judge Edward A. Infante ("Judge Infante") and is unquestionably fair, reasonable, and adequate, and deserves preliminary approval.[3]

The Settlement provides for a series of significant Corporate Governance Enhancements by Cadence. *See* Stipulation, ¶¶2.1-2.3. These changes were requested by the Plaintiffs to address the

_____

[3]    Judge Infante is a retired United States District Court Judge and has extensive experience in mediating complex securities fraud, class action, and shareholder derivative disputes. Unless otherwise stated, all capitalized terms herein have the same meaning set forth in the Stipulation.

MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT - C-08-4966 SC        - 2 -

circumstances that Plaintiffs allege contributed to the climate giving rise to the misconduct and improper revenue recognition alleged in the Actions. The Corporate Governance Enhancements also strengthen Cadence's corporate governance practices and internal controls generally, which provide substantial and lasting value to Cadence and Current Cadence Stockholders. For example, the Settlement establishes procedures for the Board to institute a process to review, at least annually, revenue recognition policies (in consultation with the Company's independent outside auditor) to determine whether changes to the policies are appropriate. *Id.* Additional examples of the excellent new governance to be achieved via the Settlement are provisions pursuant to which the Company's Internal Auditor will report to the Board at least annually on the Company's compliance with its revenue recognition policies, and the adequacy of the Company's internal controls related to financial reporting. *Id.* Procedures are also to be enacted pursuant to the Settlement Agreement to improve training of the Company's sales and finance personnel and to enact a requirement for senior employees at the Company's foreign operations to certify in writing on a quarterly basis to Cadence's Chief Financial Officer that there are no agreements or understandings with customers regarding revenue recognition that have not been disclosed to the Company's auditors. *Id.*

In sum, the Settlement confers substantial benefits upon Cadence and Current Cadence Stockholders and is an excellent resolution for Cadence of litigation of substantial complexity and cost. As a direct result of the Settlement, Cadence is positioned to reap long-term benefits from the Corporate Governance Enhancements. After negotiating the material terms of the Settlement, counsel for Plaintiffs and Cadence, with the assistance of Judge Infante, negotiated the amount of attorneys' fees and expenses for Plaintiffs' Counsel. As a result of those arm's-length negotiations, Cadence has agreed that Plaintiffs' Counsel be paid $1,750,000 in cash (the "Fee Award"). *See* Stipulation, ¶6.1.

Plaintiffs ask the Court to enter the [Proposed] Order Preliminarily Approving Derivative Settlement and Providing for Notice ("Preliminary Approval Order"), which provides for: (a) granting preliminary approval of the Settlement, (b) directing that notice be given to Current Cadence Stockholders, and (c) scheduling a hearing at which the Court will consider final approval of the Settlement (the "Settlement Hearing"), including the Fee Award and the award of $2,500 to

each of the Plaintiffs in the Actions (the "Service Awards"). In determining whether preliminary approval is warranted, the issue before the Court is whether the proposed Settlement is within the range of what might be found to be fair, reasonable, and adequate, such that notice of the proposed Settlement should be provided to Current Cadence Stockholders and that the Settlement Hearing should be scheduled. As discussed herein, the Settlement easily meets this standard and therefore the Court should preliminarily approve the Settlement.

## II.    OVERVIEW OF THE ACTIONS

Each of the Actions is brought on behalf of Nominal Defendant Cadence, a Delaware corporation headquartered in San Jose, California. *See* Weiser Decl., ¶¶1-4. Cadence develops electronic design automation ("EDA") software and hardware for the design and verification of semiconductor chips and systems for electronics companies. *See e.g.* Hamilton Docket No. 1 (Complaint), ¶2. EDA cards essentially work as debit cards, allowing customers to purchase items within a catalog at the prices specified therein up to the amount of cash that has been loaded onto the cards. *Id.*, ¶4.

The Actions collectively allege that from at least January 2008 to the present (the "Relevant Period"), the Individual Defendants caused Cadence to overstate revenues and earnings by, *inter alia*, prematurely recognizing revenue on customer contracts arising from usage of the EDA cards in violation of Generally Accepted Accounting Principles ("GAAP"), and by causing customers to prematurely renew their existing contracts with Cadence at steep price discounts with the condition that the customer agree to convert the contracts from term contracts to subscription contracts. *See e.g.*, *id.*, ¶¶4-7 & 13-15.

Ultimately, on October 22, 2008, the Individual Defendants caused Cadence to announce that it would need to restate its revenues and earnings for the first two fiscal quarters of 2008. *Id.*, ¶34. The announcement stated that the Board's Audit Committee (the "Audit Committee") and its independent counsel were conducting an "investigation" concerning the Company's historical revenue recognition practices (the "Investigation"). On this news, Cadence's stock price dropped over 25% in one day from $4.32 per share to $3.22 per share. *Id.*, ¶34-35.

Beginning on October 29, 2008, multiple securities fraud class actions were filed in the Federal Court, in which Cadence and several of the Individual Defendants were named as defendants. *See* Docket Nos. 1, 10, 19, 22. On March 4, 2009, these actions were consolidated into one action, *In re Cadence Design Systems, Inc. Sec. Litig.*, No. C-08-4966-SC (the "Securities Action"), and a Lead Plaintiff and a Lead Counsel were appointed. *See* Docket No. 36. On October 14, 2009, the Lead Plaintiff in the Securities Action filed a First Amended Complaint for Violations of the Federal Securities Laws (the "Securities Action Complaint"). *See* Docket No. 51. On March 2, 2010, this Court denied the defendants' motion to dismiss the Securities Action in its entirety. *See* Docket No. 71.

Shortly after the Securities Action was commenced in this Court, on November 18, 2008 and December 1, 2008, respectively, plaintiffs Ury Priel ("Priel") and Mark Levine ("Levine") filed shareholder derivative complaints against the Individual Defendants on behalf of Cadence in the State Court. On January 20, 2009, the Court consolidated the actions filed by Priel and Levine, thus forming the State Action. On May 25, 2011, Levine filed a Request for Dismissal with the State Court, seeking leave to dismiss with prejudice the shareholder derivative action that he filed on December 1, 2008. *See* Weiser Decl., ¶4.

On December 10, 2008, the Individual Defendants caused Cadence to announce that the Audit Committee of the Board of Directors (the "Board"), with the assistance of special counsel Wilson, Sonsini, Goodrich & Rosati ("Wilson Sonsini"), completed the Investigation of, among other things, the recognition of revenue related to customer contracts, and that as a result of the Investigation, the Company would restate its quarterly financial statements for the first two quarters of 2008. *See, e.g.*, Hamilton Docket No. 1 at *id.*, ¶36. The Company further announced that the Audit Committee concluded that the circumstances that led to the restatement were not the result of illegal conduct on the part of any of Cadence's directors, officers or other employees. As a result of the Investigation, however, the Company identified a material weakness relating to the insufficient design and ineffective operation of certain internal controls over the recognition of revenue on customer contracts. *Id.*

MOTION FOR PRELIMINARY APPROVAL OF DERIVATIVE SETTLEMENT - C-08-4966 SC       - 5 -

On April 28, 2010, plaintiff Walter Hamilton initiated the *Hamilton* Action on behalf of Cadence. *See* Hamilton Docket No. 1. On August 16, 2010, plaintiff Arash Samani initiated the *Samani* Action. *See* Samani Action Docket No. 1. On August 17, 2010, plaintiff George Powers ("Powers") initiated the *Powers* Action.[4] *See* Powers Action Docket No. 1. During the development and prosecution of the Actions, Plaintiffs' Counsel conducted extensive investigations concerning the alleged facts, including, but not limited to: (1) inspecting, reviewing and analyzing the Company's public filings; and (2) reviewing certain of the Company's internal documents.[5] Collectively, the Actions alleged that Cadence was harmed, by among other things, the costs of the Investigation, the damage to the Company's reputation and loss of investor confidence, the impact of the circumstances leading to the announcement that the Company would need to restate its financials, and the impairment of future revenue streams. *See* Hamilton Docket No. 1.

## III.    SUMMARY OF SETTLEMENT HISTORY

On August 17, 2009, and August 12, 2010, respectively, counsel in the State Action and counsel in the *Hamilton* Action, on behalf of their respective clients, sent letters (the "Settlement Demands") to counsel for Cadence and the Individual Defendants. *See* Weiser Decl., ¶5. The Settlement Demands, *inter alia,* summarized the allegations and claims asserted by Plaintiffs on behalf of the Company in the Actions, and demanded the Company's agreement to a series of proposed corporate governance reforms which were specifically tailored to address, and prevent a recurrence of, the alleged wrongdoing that is the subject of the Actions. *See* Weiser Decl., ¶5.

After exchanging certain information, on August 25, 2010, the Settling Parties[6] participated in a formal joint mediation before Judge Infante, a JAMS mediator, in San Francisco, California.

---

[4]    Prior to Samani and Powers filing shareholder derivative actions on behalf of Cadence, these plaintiffs serve a litigation demand upon the Board on June 29, 2010.

[5] Further detail concerning the work undertaken by Plaintiffs' Counsel is set forth in Section II of the Stipulation. In addition, the Settlement provides the opportunity for additional confirmatory discovery to be conducted by Plaintiffs and Plaintiffs' Counsel following the Court's entry of the Preliminary Approval Order.

[6]    Counsel for Samani and Powers were not participants in the August 25, 2010 mediation.

*See, e.g.*, Weiser Decl., ¶6. Although the Settling Parties made some progress at the mediation, the Actions did not settle at that time. *Id.* The mediation, however, served as springboard for continued settlement discussions which occurred throughout the fall of 2010. *Id.* Ultimately, the Settling Parties agreed to engage in a final mediation before Judge Infante on February 8, 2011 in San Francisco, California. *Id.* With the substantial assistance of Judge Infante, the Settling Parties were able to reach an agreement-in-principle on the settlement terms, which ultimately culminated in the proposed settlement (the "Settlement") reflected in the Stipulation. *Id.*

## IV.    THE SETTLEMENT TERMS

### 2.    The Settlement

#### 2.1.    Corporate Governance Enhancements

The corporate governance provisions described in this paragraph (the "Corporate Governance Enhancements") have been approved by the Board, and will be effective upon the Effective Date.  The Company and the Board acknowledge that the commencement and litigation of the Actions is a material and substantial factor in causing Cadence to agree to implement the Corporate Governance Enhancements.

a)    Revenue Recognition

i)    The Company's management and Board will institute a process to review, on at least an annual basis, the Company's revenue recognition policies and analyze, in consultation with the Company's independent outside auditor, whether changes to those policies are appropriate.

1)    The Company's Chief Financial Officer ("CFO") and Controller will, on at least an annual basis, meet with the Company's Revenue Accounting Department and the Company's independent outside auditor, for the purpose of reviewing the Company's revenue recognition policies.  At least the following matters will be reviewed at this meeting:

1.    The accounting standards and guidance relevant to revenue recognition;

2.    Any new accounting standards or guidance relevant to Cadence (including any proposed changes to standards or guidance);

3.    Any areas related to revenue recognition where significant judgment is required for application of Cadence's revenue recognition policies;

4.    The adequacy of Cadence's internal controls over financial reporting related to revenue recognition.

2)    The Company's CFO will present the conclusions of these meetings to the Audit Committee of the Board within thirty (30) days after their conclusion, and shall discuss with the Audit Committee whether any changes to the

Company's policies should be adopted. The Company will request that its independent outside auditor be present at this meeting and available to answer questions.

ii) The Company will require that its independent outside auditor report in writing to the Audit Committee at least annually regarding: (i) whether it recommends any changes to the Company's revenue recognition policies or (ii) its internal controls over financial reporting related to revenue recognition. The Company will require that its independent outside auditor also meet privately, at least annually, with the Audit Committee to discuss the Company's revenue recognition policies, guidelines, procedures, and the adequacy of its internal controls over financial reporting.

iii) The Company's Internal Auditor will report to the Board at least annually regarding the Company's compliance with its revenue recognition policies, and the adequacy of the Company's internal controls related to financial reporting. If the Company's Internal Auditor becomes aware of any significant issue(s) (or potentially significant issue(s)) regarding the Company's compliance with its revenue recognition policies or the adequacy of Cadence's internal controls over financial reporting relating to revenue recognition, or any other matter, the Internal Auditor will report the issue in writing promptly to the Company's General Counsel and Audit Committee.

iv) The Audit Committee will meet at least annually with the Company's CFO and the independent outside auditor to review the Company's disclosure process used in preparing and reviewing draft financial statements. This meeting will, at minimum, address whether the Company's disclosures related to revenue recognition and internal controls over financial reporting are appropriate, and whether the Company's processes related to those disclosures are appropriate.

v) All sales finance personnel will receive, at least annually, instruction on the Company's revenue recognition policies, and will be asked to certify, in writing, annually that they have a sufficient understanding of the policies to recognize how their activities can impact revenue recognition. If any significant changes are made to the Company's revenue recognition policies that relate to or concern the responsibilities of sales finance personnel, they will promptly participate in training regarding these changes, and certify, in writing, their understanding of these changes.

b)    Foreign Operations

i) The senior employee at each foreign operation or sales team with foreign customers will certify, in writing, to the Company's CFO on a quarterly basis that, after reasonable inquiry, he or she can state that there are no agreements or understandings with the Company's customers relevant to revenue recognition which have not been fully disclosed to the Company's auditors.

c)    Board Policies

i) The Board will solicit bids from audit firms and consider whether it is appropriate to recommend to stockholders a ratification of a change in audit firms.

ii) The Board will participate in training on relevant topics, including but not limited to, internal controls, SEC and Sarbanes-Oxley Act of 2002

compliance, executive compensation, revenue recognition, and internal controls over financial reporting, provided by a qualified third party (such as a reputable "Director College" or an internationally-recognized law or accounting firm), on at least an annual basis.

iii) The chair of each committee of the Board shall rotate at least once every seven years (the first such rotation to occur no later than 2018), subject to the discretion of a majority of the independent directors of the Board to allow an individual to remain as chair of a particular committee for such longer time as it determines to be in the best interests of Cadence and its shareholders.

iv) The Audit Committee will, at least annually, formally review Cadence's policies related to revenue recognition and the adequacy of its internal controls over financial reporting with the Company's CFO and independent outside auditor, as well as the relevant internal controls over financial reporting that the Company has in place regarding revenue recognition. This review will take into account at least the following matters:

1) Any relevant changes to revenue recognition accounting standards, internal controls or guidance; and

2) Whether the Company should make any changes to its internal controls related to revenue recognition and/or financial reporting.

v) Cadence will continue to maintain director and officer stock ownership guidelines.

vi) The Compensation Committee of the Board will meet at least three times per year. The subjects of these meetings will include at least the following:

1) Whether the Company's corporate goals and objectives related to compensation of its senior management are appropriate.

2) Evaluation of the performance of the Company's senior management relative to the corporate goals and objectives related to compensation of senior management.

3) Review and evaluation of the Company's "Compensation Discussion and Analysis" and related disclosures.

4) Consider and be responsible for approving or denying any severance payments to Named Executive Officers if the employee was terminated or resigned.

vii) The Compensation Committee of the Board will retain an independent consultant at least once every three years to conduct a study of Cadence's executive compensation policies, relative to its peer companies. The results of each such study will be promptly presented to the Compensation Committee and the full Board.

2.2. Earlier Corporate Governance Enhancement

a) Cadence adopted the following earlier corporate governance enhancement (the "Earlier Corporate Governance Enhancement") after the filing of

one or more of the Actions: Cadence adopted a "clawback" policy relating to the effect of restating financial statements on compensation (see Proxy Statement for the 2010 Annual Meeting of Stockholders), which shall be maintained consistent with then-applicable law. In adopting the Earlier Corporate Governance Enhancement, Cadence considered the allegations of wrongdoing made in the Actions. The Earlier Corporate Governance Enhancement was made at least in part in recognition of the Actions.

b)    Separate from the Earlier Corporate Governance Enhancement, Cadence added a new independent director to its Board in 2011. Cadence will not dispute that the Actions were considered in connection with addition of this new independent director to the Board in 2011.

2.3.    Cadence agrees that these policies will remain in effect and be adhered to for a period of at least three (3) calendar years from the date of the final approval of the settlement unless any of these measures would conflict with a change in relevant law or listing standards (the "Effective Period").[7]

## V.    THE PROCESS AND STANDARDS FOR PRELIMINARY APPROVAL OF A DERIVATIVE SETTLEMENT

### A.    Public Policy Favors the Settlement of Litigation

There is a strong policy favoring compromises that resolve litigation. *See Williams v. First Nat'l Bank*, 216 U.S. 582 (1910); *MWS Wire Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986) (citing an "'overriding public interest in settling and quieting litigation'"); *In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("'strong judicial policy'" favors settlements). Settlements of shareholder derivative actions are particularly favored because such litigation "'is notoriously difficult and unpredictable.'" *Maher v. Zapata*, 714 F.2d 436, 455 (5th Cir. 1983); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005) (same). Indeed, settlements of derivative actions are "favored for the reasons that settlements generally are favored: disputes are resolved; the resources of litigants and the courts are saved; and, in the case of a derivative action, management can return its attention and energy from the courtroom to the corporation itself." *Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986). *See also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) (settlements are favored "particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding

_____

[7]    The Stipulation also provides that the Plaintiffs, derivatively for Cadence, and Cadence, will provide releases to the Individual Defendants, and provides for certain other releases, as detailed at Section 5 of the Stipulation.

formal litigation"); *In re NVIDIA Corp. Derivative Litig.,* No. C-06-06110-SBA (JCS), 2008 WL 5382544, at *2 (N.D. Cal. Dec. 22, 2008) (same).

**B.      Preliminary Approval Requires Only that a Settlement Be Within the "Range of Possible Approval" and Not Disclose Grounds to Doubt Its Fairness or Contain Obvious Deficiencies**

The settlement of a shareholder derivative action requires court approval. *See* Fed. R. Civ. P. 23.1(c) (a derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval"). At the preliminary approval stage, the sole issue before the court is whether the proposed settlement is within a range of what might be found fair, reasonable, and adequate, so that notice of the proposed settlement can be given to shareholders and a date set for a final hearing to consider final settlement approval. *See Manual for Complex Litigation (Fourth)* §21.632, at 490-91 n.976; §21.633, at 491; §13.14, at 236 (4th ed. 2010). As the *Manual for Complex Litigation* explains:

> If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.

*Manual for Complex Litigation (Third)* §30.41, at 237 (3d ed. 1995). *See also NVIDIA*, 2008 WL 5382544, at *2 ("[i]n order to grant preliminary approval, the Court need only conclude that the settlement of the claims on the agreed upon terms is 'within the range of possible approval'"); *Satchell v. Fed. Express Corp.,* No. C 03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) (granting preliminary approval after finding proposed settlement was non-collusive, had no obvious defects and was within the range of possible settlement approval).

Thus, preliminary approval does not require the trial court to answer the ultimate question – whether a proposed settlement is fair, reasonable, and adequate. Rather, the ultimate determination is made only after notice of the settlement has been given to the members of the settlement class and

after they have been given the opportunity to comment on the settlement. *See Manual for Complex Litigation (Fourth), supra,* at §§21.633, 21.634.[8]

The Ninth Circuit has provided factors which may be considered in evaluating the fairness of a class action settlement:

> The district court's ultimate determination will necessarily involve a balancing of several factors which may include, among others, some or all of the following: the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982); *accord Torrisi v. Tucson Elec. Power Co.,* 8 F.3d 1370, 1375 (9th Cir. 1993). As noted above, the Court need not reach a determination at this juncture as to whether the factors set forth by the Ninth Circuit in *Officers for Justice,* 688 F.2d 615, have been met. However, for guidance to the Court, Plaintiffs provide an overview herein to demonstrate that the *Officers for Justice* factors warrant preliminary approval of the current Settlement.[9]

Finally, the court must exercise "sound discretion" in approving a settlement. *Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), *aff'd,* 661 F.2d 939 (9th Cir. 1981); *Torrisi,*

_____

[8] At the final approval stage, the court's role in evaluating this derivative Settlement will be similar to that applicable when the Court evaluates class action settlements. *See* 7 William Rubenstein, Alba Conte, Herbert B. Newberg, *Newberg on Class Actions,* §22.110 (4th ed. 2010) ("[t]he role of the court and criteria to be considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in a class action"). Therefore, it is instructive to examine case law regarding settlements in class actions, while recognizing that not all factors will be applicable to a derivative action.

[9] It is unknown whether any Current Cadence Stockholders will object to the Settlement. Plaintiffs anticipate, however, that Current Cadence Stockholders will find the strong improvements in Cadence's corporate governance to be a substantial benefit to the Company. Other of the *Officers for Justice* factors are not present herein, such as the "risk of maintaining class action status throughout the trial." *Officers for Justice,* 688 F.2d at 625. Further, although no formal discovery has occurred, the Stipulation permits substantive "confirmatory discovery." *See* Stipulation, ¶3. Nevertheless, even where little formal discovery has occurred, a proposed settlement should be approved if the parties have sufficient information to allow them to make an informed decision about the settlement. *See Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir. 1998) ("'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement'").

8 F.3d at 1375. However, in exercising its discretion, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. The Ninth Circuit defines the limits of the inquiry to be made by the court in the following manner:

> Therefore, the settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor this court is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators.

*Id.* (emphasis in original).  As set forth below, the Settlement warrants preliminary approval.

## VI.    THE SETTLEMENT SHOULD BE PRELIMINARILY APPROVED AND ULTIMATELY FINALLY APPROVED AFTER NOTICE TO CURRENT CADENCE STOCKHOLDERS

### A.    The Stipulation Is the Result of Arms-Length Bargaining With the Oversight of a Neutral Mediator and Thus There Are No Grounds to Doubt Its Fairness

The Settlement of the Actions was reached only after substantial negotiations between the Settling Parties concerning the Corporate Governance Enhancements, which terms were vigorously discussed during a period of nearly one year.  The negotiations were often contentious and at times reached an impasse.  Indeed, the Settlement was achieved only as a result of two lengthy mediation sessions overseen by a neutral mediator – the well respected and experienced Judge Infante.  *See* Weiser Decl., ¶¶6-12.  *See also NVIDIA,* 2008 WL 5382544, at *3 (Judge Infante's oversight of mediation process supports preliminary approval in that a neutral and experienced mediator supports the appearance of good faith arm's-length bargaining).  The present Settlement is a textbook example of arm's length bargaining and there are no grounds to doubt its fairness.  Preliminary approval is appropriate where the settlement agreement is the product of arm's-length negotiation, is facially sufficient, and is within the range of possible recovery. *See, e.g., Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1290 (9th Cir. 1992).

**B.     The Settlement Was Negotiated Only After Substantial Investigation and Analysis by Counsel Abundantly Experienced in Similar Complex Derivative Litigation**

In addition to contentious arm's-length bargaining, the Settlement was negotiated only after Plaintiffs' Counsel engaged in substantial investigation relating to Plaintiffs' factual assertions and legal claims, including: (i) analyzing and drafting complaints against the Individual Defendants; (ii) monitoring and reviewing public filings and news and analyst reports; and (iii) conducting legal research. *See* Weiser Decl., ¶7. Plaintiffs' Counsel have substantial experience in complex derivative and class action litigation. *See* Weiser Decl., ¶¶8-12 & Exs. A-E. The agreement by such counsel to enter the Stipulation reflects their determination that the benefits of the Settlement to Cadence and Current Cadence Stockholders outweigh the uncertainty of long-term litigation.

Applicable law provides that the conclusion of experienced counsel should be afforded considerable weight by the Court. *See Pac. Enters.*, 47 F.3d at 378 ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation"); *NVIDIA*, 2008 WL 5382544, at *4 (significant weight should be attributed to counsel's belief that settlement is in the best interests of those affected by the settlement); *Nat'l Rural Telecomms Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts underlying litigation.'"). Indeed, counsel for Cadence and the Individual Defendants have also independently considered the Settlement and all agree that it is in the best interests of Cadence and Current Cadence Stockholders. *See* Stipulation, §III & ¶¶2.1 & 6.1. Further, as noted above, the assistance of a neutral, well-respected mediator, Judge Infante, also assured a sound result for Cadence and Current Cadence Stockholders. *Id.*, §I.

**C.     The Settlement Serves the Best Interests of Cadence and Current Cadence Stockholders**

Plaintiffs have bargained for substantial changes to Cadence's corporate governance. As detailed above and in the Stipulation, ¶¶2.1-2.3, these changes are not only specifically designed to address the governance shortcomings that contributed to the climate that purportedly gave rise to the misconduct and improper revenue recognition alleged in the Actions, but also strengthen Cadence's

corporate governance practices and internal controls generally, which provide substantial and lasting value to Cadence and Current Cadence Stockholders. For example, the Settlement establishes procedures for the Board to institute a process to review, at least annually, revenue recognition policies (in consultation with the Company's outside auditor) to determine whether changes to the policies are appropriate. Additional examples of the excellent new governance to be achieved via the Settlement are provisions whereby the Company's Internal Auditor reports to the Board at least annually on the Company's compliance with its revenue recognition policies, and the internal controls related to financial reporting. Procedures are also to be enacted pursuant to the Settlement Agreement to improve training of the Company's sales and finance personnel and to enact a requirement for senior employees at the Company's foreign operations to certify in writing on a quarterly basis to Cadence's Chief Financial Officer that there are no side agreements with customers that have not been disclosed to the Company's auditors. *See* Stipulation, ¶¶2.1-2.3.

All of these policy modifications are long-term solutions that will help avoid the circumstances that gave rise to the filing of the Actions and will help limit Cadence's future litigation exposure. *See* Weiser Decl., ¶5. Significantly, Defendants acknowledge that these modifications are of substantial benefit to the Company, and that Plaintiffs' initiation and prosecution of the Actions were a substantial factor in Cadence adopting these changes to its policies. *See* Stipulation, §2. "As corporate debacles such as Enron, Tyco and WorldCom demonstrate, strong corporate governance is fundamental to the economic well-being and success of a corporation." *NVIDIA*, 2008 WL 5382544, at *3. Indeed, "[c]ourts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies." *Cohn*, 375 F. Supp. 2d at 853. *See also Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir. 1993) (collecting cases from the Second, Fourth, Fifth, and Sixth Circuits and finding that remedial measures are an adequate basis for settlement of, and judicial approval of, derivative settlements). Moreover, the implementation of strong governance practices often yields substantially increased market capitalization for the companies who implement such policies. *See generally Investor Opinion Survey on Corporate Governance* (McKinsey & Company June 2000) [www.oecd.org/dataoecd/56/7/1922101.pdf].

Therefore, the substantial governance benefits to Cadence weigh in favor of preliminarily approving the Settlement. Indeed, because the benefits of the Settlement flow to Cadence, and to Current Cadence Stockholders only indirectly, there are no "obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class" to suggest that the Settlement is not within the "range of possible approval." *See Manual for Complex Litigation (Third), supra*, at §30.41 at 237.

**D.    The Risk, Expense, Complexity, and Likely Duration of Future Litigation of the Actions Weighs in Favor of Preliminarily Approving the Settlement**

As noted above, at the preliminary approval stage, the Court need not undertake a final analysis of the Ninth Circuit factors set out in *Officers for Justice*, 688 F.2d 615. However, it is common sense that continued litigation poses substantial risks – regardless of the strength of a plaintiff's claims. The Individual Defendants are subject to the risk that Plaintiffs will prevail on their claims. Plaintiffs face several risks related to establishing demand futility on a motion to dismiss, prevailing on the merits of their claims, and obtaining the requested relief. Further litigation would be costly to both parties in terms of time and money. As a general matter, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* §11.50, at 155 (4th ed. 2002); *Nat'l Rural Telecomms*, 221 F.R.D. at 526.

Even if Plaintiffs were successful and survived the motion to dismiss, continued litigation would be extremely complex, costly, and of substantial duration. Document discovery would need to be completed, depositions would need to be taken, experts would need to be designated, and expert discovery conducted. Cadence and the Individual Defendants' expected motions for summary judgment would have to be briefed and argued and a trial would have to be held. Indeed, significant risks remained in getting past the Cadence and the Individual Defendants' anticipated motions for summary judgment and obtaining a favorable judgment after trial. Even if liability was established, the amount of recoverable damages would still have posed significant issues and would have been subject to further litigation. The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after several more years of litigation, while providing

Cadence and Current Cadence Stockholders substantial benefits. *See Officers for Justice*, 688 F.2d at 625.

It is also clear that even a victory at trial is no guarantee that the judgment would ultimately be sustained on appeal or by the trial court. While the Ninth Circuit recently reversed and remanded the decision, the district court in *In re Apollo Group, Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2008 U.S. Dist. LEXIS 61995 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 U.S. App. LEXIS 14478 (9th Cir. June 23, 2010), on a motion for judgment as matter of law, overturned a jury verdict of $277 million in favor of shareholders based on insufficient evidence presented at trial to establish loss causation. *See also In re Apple Computer Sec. Litig.*, No. C-84-20148(A)-JW, 1991 U.S. Dist. LEXIS 15608 (N.D. Cal. Sept. 6, 1991) ($100 million jury verdict in favor of plaintiff overturned and j.n.o.v. entered in favor of defendant); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial), 64 L. Ed. 2d 783 (1980). Add to these post-trial and appellate risks, the difficulty and unpredictability of a lengthy and complex trial – where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways – and the benefits of the Settlement become all the more apparent.

In conclusion, at the Settlement Hearing, the Court will have before it detailed papers submitted in support of the Settlement and will be asked to make a determination as to whether the Settlement is fair, reasonable, and adequate and in the best interest of Cadence and Current Cadence Stockholders. While Plaintiffs believe that the Settlement merits this Court's final approval, at this time Plaintiffs respectfully request only that the Court grant preliminary approval of the Settlement. To grant preliminary approval, the Court need only conclude that a settlement of the claims against the Individual defendants is "within the range of possible approval" to preliminarily approve the Settlement for the purposes of providing notice and holding a future Settlement Hearing. As detailed above, this showing has been met.

Accordingly, for all of the foregoing reasons, Plaintiffs respectfully submit that preliminary approval of the Settlement should be granted.

## VII. THE FEE AWARD TO PLAINTIFFS' COUNSEL AND THE SERVICE AWARDS FOR PLAINTIFFS ARE FAIR AND REASONABLE

At this stage, the Court does not have to reach the decision of whether to ultimately grant the Fee Award or Service Awards. Plaintiffs' Counsel submit, however, that the requested $1.75 million Fee Award, in light of the substantial Corporate Governance Enhancements (which Cadence has acknowledged in agreeing to the Fee Award), is "within the range of possible approval" and is not "excessive compensation" as that term is used in the *Manual for Complex Litigation (Third), supra*, at 30.41 at 237 (3d ed. 1995). Indeed, as will be addressed in connection with briefing a motion for final approval (the "Final Motion"), it has long been the case that attorneys' fees are appropriate in cases even in the absence of a monetary recovery. *See, e.g., Mills v. Electric Auto Lite Co.*, 396 U.S. 375, 397-97 (1970) (awarding attorneys' fees based solely on therapeutic benefits to the corporation); *Unite Nat'l Ret. Fund v. Philip Watts*, No. 04CV3603, DMC, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005) (court awarded fee of $9.2 million for purely therapeutic relief and noted that it based the award on "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoing").

The Final Motion will detail, for example, that the Fee Award – to be shared among five different firms representing the Plaintiffs – was negotiated with the substantial oversight of Judge Infante, and that the Fee Award provision that is consistent with the benefits conferred upon Cadence and Current Cadence Stockholders. Indeed, the United States Supreme Court has endorsed the consensual resolution of attorneys' fees issues in these kinds of cases as the ideal toward which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."); *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001) (where, as here, there is no evidence of collusion and no detriment to the parties, the court should give "substantial weight to a negotiated fee amount"). Additional authorities will be presented in the Final Motion.

Further, as detailed in the Stipulation, in connection with the Final Motion, Plaintiffs' Counsel will request the ability to make a payment from the Fee Award of $2,500 to each of the

Plaintiffs for their time, effort and service as representative plaintiffs in the Actions. "'Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 400 (D.D.C. 2002). *See also In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 844, 851 (N.D. Cal. 2005) (approving $5,000 incentive awards); *In re Paypal Litig.*, No. C-02-1227-JF PVT, 2004 WL 2445244, at *1 (N.D. Cal. Oct. 13, 2004) (approving $2,500 incentive awards); *Simon v. Toshiba Am.*, No. 07-06202, MHP, 2010 WL 1757956, at *5 (N.D. Cal. Apr. 30, 2010) (approving $4,000 incentive award). As a result of Plaintiffs' efforts, Cadence and Current Cadence Stockholders have received significant corporate governance benefits to enhance Cadence's operations going forward and prevent similar misconduct from reoccurring.

At this stage, Plaintiffs only seek approval to notify Current Cadence Stockholders of the Fee Award provision and the requested Service Awards in the Notice.

## VIII.    PROPOSED SCHEDULE OF EVENTS

In connection with preliminary approval of the Settlement, Plaintiffs are requesting the Court to establish dates by which notice of the Settlement will be distributed to Current Cadence Stockholders, dates by which Current Cadence Stockholders may comment on the Settlement, and a Settlement Hearing. As set forth in the Notice (and Stipulation), submitted herewith, the Settling Parties propose the following:

| | |
|---|---|
| Notice published in *Investor's Business Daily* | 5 days after Court enters the Preliminary Approval Order |
| Filing of Notice via a Form 8-K with the SEC | 5 days after Court enters the Preliminary Approval Order |
| Last day for Cadence shareholders to comment on the Settlement | 21 days prior to the Settlement Hearing |

In addition, Plaintiffs propose that the final approval hearing be scheduled 45 days after the first date that Notice is issued to Current Cadence Stockholders. This time period will provide Current Cadence Stockholders adequate time to consider the proposed Settlement. This schedule

comports with due process, including recent guidance from the Ninth Circuit, in that it provides Current Cadence Shareholders with the opportunity to review the Final Motion papers, which will set forth the request by Plaintiffs' Counsel for approval of the Fee Award, before they are required to object to the Settlement. *See In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 990 (9th Cir. 2010).

## IX.    CONCLUSION

The Settlement achieved is an excellent result in light of the risks inherent in the litigation and the substantial cost and complexity if the case proceeded to trial. Accordingly, Plaintiffs respectfully submit that the Settlement is fair, reasonable, and adequate and should be preliminarily approved so that notice to Current Cadence Stockholders may be issued immediately.

DATED: June 15, 2011                                        Respectfully submitted,

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)

KATHLEEN A. HERKENHOFF

12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile:  858/794-1450
kah@weiserlawfirm.com

THE WEISER LAW FIRM, P.C.
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: 610/225-2677
Facsimile:  610/225-2678

CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on June 15, 2011.

s/ KATHLEEN A. HERKENHOFF
KATHLEEN A. HERKENHOFF

THE WEISER LAW FIRM, P.C.
KATHLEEN A. HERKENHOFF (168562)
12707 High Bluff Drive, Suite 200
San Diego, CA 92130
Telephone: 858/794-1441
Facsimile:  858/794-1450

kah@weiserlawfirm.com

# Mailing Information for a Case 3:10-cv-01849-SC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Norman J. Blears**
  norman.blears@hoganlovells.com,dmsalvi@hhlaw.com,michael.ewers@hoganlovells.com,darcy.melo@hoganlovells.com,ky-yen.wong@hoganlovells.com

- **Ethan D. Dettmer**
  edettmer@gibsondunn.com,bsperry@gibsondunn.com

- **Gal Dor**
  gal.dor@skadden.com

- **Kathleen Ann Herkenhoff**
  kah@weiserlawfirm.com

- **Noah A. Katsell**
  noah.katsell@dlapiper.com,joyce.graham@dlapiper.com

- **James Elliot Lyons**
  jlyons@skadden.com,michael.borden@skadden.com,btravagl@skadden.com

- **Douglas Mayer Schwab**
  douglas.schwab@hoganlovells.com,ky-yen.wong@hoganlovells.com

- **Kip Brian Shuman**
  Kip@shumanlawfirm.com,Lisa@shumanlawfirm.com

- **Garrett J. Waltzer**
  gwaltzer@skadden.com,jschilli@skadden.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Jeffrey J Ciarlanto
The Weiser Law Firm P.C.
121 N. Wayne Avenue
Suite 100
Wayne, PA 19087

Rusty E Glenn
The Shuman Law Firm
885 Arapahoe Avenue
Boulder, Co 80302

Brett D Stecker
The Weiser Law Firm P.C.
121 N. Wayne Avenue
Suite 100
Wayne, PA 19087

Robert B. Weiser
The Weiser Law Firm, P.C.
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
```